USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 6, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
UNITED STATES OF AMERICA          :
:
    -v-                                                  :    17 Cr. 008 (KBF)
:
ESTIBE MORILLO NUNEZ,             :    OPINION & ORDER
:
            Defendant.              :
:
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On January 4, 2017, a grand jury in this District indicted defendant Estibe Morillo Nunez ("Nunez"), charging him with conspiring to distribute, or possess with intent to distribute, cocaine and heroin in violation of 21 U.S.C. § 846. On April 6, 2017, Nunez moved to suppress evidence obtained in violation of his rights under the Fourth Amendment of the U. S. Constitution. (Notice of Motion at 2, ECF No. 15.) In the alternative, Nunez moved the Court to hold an evidentiary hearing to determine whether a suppression of evidence is warranted. (Id.)

For the reasons set forth below, both Nunez's motion to suppress and motion for an evidentiary hearing are DENIED. The court concludes that the stop and search of Nunez was lawful.

I.    FACTS

On December 8, 2016, at approximately 10:50 a.m., defendant Estibe Morillo Nunez ("Nunez"), was pulled over by law enforcement as he was driving into the Lincoln Tunnel toward New York City. (Complaint ("Compl.") at ¶ 9(a),

ECF No. 22-1.)  A certified narcotics-detection canine handler arrived to inspect the car shortly thereafter.[1]  (Id. at ¶ 9(b).)  While inspecting the interior of the vehicle, the canine alerted to the back of the passenger seat and to a piece of luggage in the rear of the passenger compartment, indicating the presence of controlled substances.  (Id.)  The officers conducted a search of the luggage and found two bags of glassine envelopes, two boxes of clear plastic bags, a scale, a box of rubber gloves, an industrial infiltration mask, plastic and glass tubes, and cooking pans.  (Id. at ¶ 9(c).)  The officers also located and searched a hidden compartment in the passenger seat to which the canine had alerted.  (Id. at 9(d).)  Within that compartment, the officers found and opened a cardboard box that contained three clear plastic bags with multiple bundles of paper-wrapped substances that appeared to the investigating agent to be individual-use portions of heroin, based on her training and the contents of the luggage.  (Id.)  The officers located and searched a second hidden compartment in the rear of the vehicle.  (Id. at ¶ 9(e).)  In the second compartment, the officers found six individually wrapped packages that together weighed approximately six kilograms.  (Id. ¶ 9(e).)  The officers inspected the packages and found a white, powdery substance that later tested positive for cocaine.  (Id. at ¶ 9(e).)

The facts leading up to the December 8, 2016, stop are as follows.  Since about February 2015, the Drug Enforcement Agency ("DEA") has conducted an

---

[1] Although Nunez's Memorandum of Law in support of his motion to suppress claims that the wait was "approximately three hours or more," (Mem. of Law in Support at 7, ECF No. 14.), Nunez did not state this fact in his affidavit dated April 19, 2017.  (See ECF No. 18.)  Therefore, the Court accepts as fact the sworn statement of Special Agent Cardona, dated December 8, 2016, where she said the canine unit arrived "shortly after" the stop.  (Cardona Depo. at 4.)

investigation of a California and Mexico-based drug trafficking organization ("DTO") that uses commercial trucks to transport narcotics to various locations throughout the United States, including the New York metropolitan area. (Agent Affidavit in Support of Warrant and Order for Cellphone Location and Pen Register Information executed December 5, 2016 ("Cardona GPS Aff.") at ¶ 8, ECF No. 22-2.) The DTO recruits drivers who deliver legitimate cargo throughout the country and employs them to stop along the way (often at truck stops) to deliver narcotics to customers in the New Jersey/New York area, and then to transport the sales proceeds back to California. (Id.) Using geolocation information, toll analysis, and common-call analysis, the DEA has identified truck drivers and coordinators involved in this narcotics trafficking and has thereby intercepted numerous DTO shipments. (Id. at ¶ 9.) In 2015, and 2016, these seizures, on separate occasions, included: (a) approximately 30 kilograms of heroin; (b) approximately $500,000; (c) approximately 30 kilograms of heroin and 32 kilograms of cocaine; (d) approximately 2 kilograms of heroin; (e) approximately 5 kilograms of methamphetamine; (f) approximately 14 kilograms of heroin and approximately 3 kilograms of methamphetamine; (g) approximately 4 kilograms of heroin; and (g) approximately 30 kilograms of cocaine. (Id.)

Around September 2016, agents with the DEA suspected that a particular commercial truck driver ("Driver-2") was transporting drugs on behalf of the DTO with a truck ("Truck-2"). (Id. at ¶¶ 13-15.) On or about October 26, 2016, agents of the DEA visually surveilled Truck-2 at a truck stop ("Truck Stop") near Kearny,

New Jersey, in part, by tracking the location of a cellphone used by Driver-2. (Id. at ¶ 15(a).) Agents then witnessed a van pull into the Truck Stop. (Id. at ¶ 15(b).) Then they observed Driver-2 carry a weighted-down white bag from his truck and hand it to the driver of the van. (Id. at 15(b).) After the van left the Truck Stop, law enforcement agents pulled over the van, and, after a consensual search of the vehicle, they discovered four kilograms of heroin in the same white bag that was handed to the driver of the van. (Id. at ¶ 15(d).)

After the October 26 operation involving Driver-2, DEA agents obtained a warrant for the location data of another driver ("Driver-1"). (See Cardona GPS Aff. ¶ 17-23.) The warrant request was based in part on the fact that Driver-1's cellphone was in contact with the alleged coordinator of the DTO, and Driver-1's cellphone was also in contact with Driver-2. (Id. at ¶¶ 18, 19(a).) The information obtained through tracking Driver-1's cellphone geolocation data led DEA agents to surveil the same truck stop as the October 26 operation on December 8, 2016. (Compl. at ¶ 7(b).)

On December 8, 2016 at approximately 9:15 a.m., Special Agent Cardona and other agents began surveillance of the Truck Stop and observed the truck associated with Driver-1's cellphone data parked there. (Cardona Depo. at ¶ 6(b).) At approximately 10:30 a.m., Special Agent Cardona witnessed a Chevrolet Suburban (the "Nunez Chevy") pull up next to the truck. (Id. at ¶ 8(a).) The truck driver retrieved a black bag from the truck and placed it in the back seat of the Nunez Chevy. (Id. at ¶ 8(b).) The Nunez Chevy remained parked at the Truck Stop for

4

approximately two minutes, then departed onto the New Jersey Turnpike heading towards New York City. (Id. at ¶ 8(c).)

About twenty minutes later, at approximately 10:50 a.m., the Nunez Chevy passed through a toll booth to enter the Lincoln Tunnel into New York City. (Id. at ¶ 9(a).) Shortly thereafter, law enforcement agents stopped the Nunez Chevy and discovered an individual later identified as Estibe Morillo Nunez, the defendant, as the driver. (Id.) As discussed above, shortly thereafter, a certified narcotics-detection canine handler exposed the vehicle to his trained canine for inspection, resulting in the discovery of narcotics and narcotics paraphernalia in the vehicle.

## II. DISCUSSION

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Davis v. United States, 564 U.S. 229, 236 (2011). If a court concludes that a search or seizure violated the Fourth Amendment, it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure. See Mapp v. Ohio, 367 U.S. 643 (1961). The exclusionary rule is "a deterrent sanction," Davis, 564 U.S. at 231-32, and "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

5

As a prudential doctrine, see Davis, 564 U.S. at 236, the exclusionary rule is "applicable only . . . where its deterrence benefits outweigh its substantial social costs," as "suppression of evidence . . . has always been our last resort, not our first impulse." Strieff, 136 S. Ct. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). Because defendant challenges the stop that resulted in the ultimate discovery of the cocaine in defendant's vehicle, the Court discusses the legal principles associated with the issues.

    a. The Terry Stop

The "ultimate measure" of the constitutionality of a governmental search or seizure is its "reasonableness". United States v. Bailey, 743 F.3d 322, 331 (2014) (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995)). Generally, "reasonableness" requires a particularized judicial warrant based on probable cause prior to a search or seizure. Bailey, 743 F.3d at 331. However, in Terry v. Ohio, the Supreme Court held that in certain circumstances, "reasonableness" allows a police officer to temporarily detain a person for questioning without a warrant. 392 U.S. 22-25 (1968).

A Terry stop of a person or vehicle must be justified by a "reasonable suspicion" to believe that the individual is "engaged in illegal activity." United States v. Arvizu, 534 U.S. 266, 273 (2002). A reasonable suspicion requires more than a mere "hunch;" rather, it demands "specific and articulable facts" and a "particularized and objective basis" to suspect illegal conduct. Terry, 392 U.S. at 21, 27; Arvizu, 534 U.S. at 273. Officers may still draw upon their "own experience and

6

specialized training to make inferences from and deductions about the cumulative information available to them." Arvizu, 534 U.S. at 273.

A reviewing court will look at the "totality of the circumstances" when determining whether there was a reasonable suspicion to support a Terry stop. Bailey, 743 F.3d at 333. The standard for a reasonable suspicion is "not high." See Richards v. Wisconsin, 520 U.S. 385, 394 (1997) (citing Terry, 392 U.S. at 30, and describing the standard for reasonable suspicion in the context of a no-knock search). It is "less demanding than probable cause," and only requires sufficient facts to reasonably suspect that criminal activity "'*may* be afoot.'" United States v. Singletary, 798 F.3d 55, 60 (2d Cir. 2015) (quoting Terry, 392 U.S. at 30) (emphasis in original). Furthermore, the Constitution "does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal activity may be afoot." Singletary, 798 F.3d at 61 (holding that although carrying an object that was the "standard size of a beer" can could have also been a soft drink, the totality of the circumstances and the officer's experience supported a reasonable suspicion that it was beer) (quotation marks omitted).

Applying these principles here, the Court holds that, under the totality of the circumstances, the detaining officers had a particularized and objective basis to support a reasonable suspicion that the defendant was engaged in illegal activity. Accordingly, an investigative Terry stop was justified. First, Nunez met the truck driver, Driver-1, in a suspicious location. The geolocation from Driver-1's cellphone

7

led Special Agent Cardona and other law enforcement agents to surveil the Truck Stop on December 8, 2016. (Compl. ¶ 7.) This was the same truck stop where four kilograms of heroin was delivered less than six weeks prior.

Additionally, Special Agent Cardona and other officers observed Nunez engaging in suspicious conduct. They watched his Chevy pull up next to Driver-1's truck whose cellphone geolocation data led them to the Truck Stop. They then observed Driver-1 retrieve a black bag from his truck and place it in the back seat of the Nunez Chevy. This conduct was nearly identical to the conduct observed less than six weeks prior, in which officers discovered an exchange of four kilograms of heroin. See United States v. Delossantos, 536 F.3d 155, 166 (2d Cir. 2008) ("[P]atterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before." (quotation marks omitted)). Under the totality of the circumstances, it was constitutionally reasonable for the officers to stop Nunez's vehicle.

Defendant's claim that the search was unconstitutional because too much time elapsed between when he was stopped and when the canine unit arrived is without merit. While it is true that during an investigatory Terry stop law enforcement must quickly "confirm or dispel their suspicions," no bright-line rule dictates how much time is permitted, and courts "should not indulge in unrealistic second-guessing." United States v. Sharpe, 470 U.S 675, 686 (1985). Here, the

canine unit arrived on the scene shortly after the Nunez Chevy was pulled over and, therefore, the stop was constitutionally reasonable. (Compl. ¶ 9(b).)

In addition, exposing the Nunez Chevy to a canine unit did not in and of itself implicate the Fourth Amendment because exposing objects to a canine dog does not amount to a "search." United States v. Place, 462 U.S. 696, 707 (1983) (holding that exposing luggage to a canine in the airport did not qualify as a "search"). The Supreme Court held that during a lawful traffic stop, "the use of a well-trained narcotics dog . . . generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409 (2005). Furthermore, the Supreme Court has stated that they "are aware of no other investigative procedure that is so limited both in manner in which the information is obtained and the content of the information revealed by the procedure" as the use of canines for this purpose. Place, 462 U.S. at 707. Accordingly, exposing the Nunez Vehicle to a canine unit did not violate any constitutional principles, and the evidence obtained thereby is not the "fruit of a poisonous tree."

    b. Automobile Exception

As discussed, under the Fourth Amendment, not all searches or seizures require a warrant. Police may conduct a warrantless search of a readily mobile motor vehicle if there is probable cause to believe it contains contraband or other evidence of a crime. United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004). Probable cause exists when, under the totality of the circumstances, there is a "'fair probability that contraband or evidence of a crime will be found in a particular

place.'" Walcyk v. Rio, 496 F.3d 139, 155 (2d Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The probable cause is lower than a preponderance of the evidence. United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007). A court assesses probable cause based on the totality of the circumstances from the perspective of a reasonable law enforcement officer who may take his or her training and experience into account when making such assessments. Delossantos, 536 F.3d at 159.

Applying these principles here, the Court holds that, under the totality of the circumstances, the detaining police officers had probable cause to believe the Nunez Chevy contained contraband, justifying a search of his vehicle. Nunez cannot and does not challenge that probable cause existed to believe Driver-1 was transporting narcotics. Nunez met Driver-1 in a suspicious location: As discussed, the geolocation from Driver-1's cellphone led Special Agent Cardona and other law enforcement agents to surveil the Truck Stop on December 8, 2016, this was the same truck stop where four kilograms of heroin was delivered less than six weeks prior. Cardona and other officers witnessed Driver-1 engage in conduct with Nunez nearly identical to the conduct observed less than six weeks prior in which officers discovered an exchange of four kilograms of heroin. Based on the "totality of the circumstances" the Court concludes that law enforcement had probable cause to believe that the Nunez Chevy contained contraband, and therefore had probable cause sufficient to justify a vehicle search without a warrant.

III. CONCLUSION

For the reasons set forth above, Defendant's motion to suppress is denied.

SO ORDERED.

Dated: New York, New York
June 6, 2017

_____
KATHERINE B. FORREST
United States District Judge